ERIE RAILROAD COMPANY, PLAINTIFF IN ERROR, v.
WANAQUE LUMBER COMPANY, DEFENDANT IN ERROR.

Argued December 13, 1907—Decided March 2, 1908.

1. When the charges of a railroad for demurrage, or "car service,"
   are based on tariffs filed with the interstate commerce commis-
   sion, as provided by the Interstate Commerce act, such charges as
   to cars engaged in interstate commerce are conclusively presumed
   reasonable in a state court, in the absence of any action of the
   commission thereon.
2. The word "receipt," as in common use, means no more than a
   bare acknowledgment of having received something, and in the
   absence of evidence to show the contents of a "receipt" on the
   trial, it was error to permit the jury to assume that the writing
   contained any special clause enlarging or qualifying such acknowl-
   edgment.
3. In the absence of special contract a carrier is not bound to make
   delivery of goods at any other than the usual place of delivery.

On error to the Supreme Court.

For the plaintiff in error, *Collins & Corbin.*

For the defendant in error, *W. Carrington Cabell.*

The opinion of the court was delivered by

PARKER, J.   This is an action by a carrier to recover from
the defendant lumber company freight charges and demurrage
on four separate carloads of merchandise, and demurrage
alone on a fifth, freight on that car having been paid.   One
car, No. 100,824, was consigned to the defendant.   One, No.
70,183, was shipped by a corporation named the Morse Com-
pany to their own order, and ordered delivered to defendant
on payment of freight.   The remaining three cars were con-
signed by a firm named Alcott & Company to their own order,
and ordered delivered to defendant on payment of freight,
under a general arrangement between defendant and Alcott
& Company that the freight should be deducted from the
price of the merchandise, and thus be paid eventually by
Alcott & Company.

The defendant conceded the correctness of the freight bills as to amount, and stipulated that it was liable for them if the respective cars were properly delivered, but denied that proper delivery had been made. Apparently no question was raised on the trial, but that defendant was liable for freight on any car of which a proper tender had been made, whether accepted or not, and the case seems to have been tried on that theory. This fact disposes of a troublesome question as to defendant's liability, for not one of the five cars was actually delivered and accepted, plaintiff in each case asserting and enforcing its lien, or claim of lien, for both freight and demurrage, and defendant in some cases refusing to receipt, in some refusing to pay demurrage, sometimes both, and as there was no specific contract of defendant with the railroad to pay freight, they would seem not to be liable unless there was actual delivery and acceptance, the primary liability resting on the consignors (*Grant* v. *Wood,* 1 *Zab.* 292; *Central Railroad* v. *MacCartney,* 39 *Vroom* 165; 6 *Cyc.* 500, 501) ; or unless the railroad was entitled to sue on the arrangement between Alcott & Company and defendants as to deduction of the freight from Alcott's bill as a contract made for its benefit. *Joslin* v. *New Jersey Car Spring Co.,* 7 *Vroom* 141. Even acceptance by consignee of delivery does not conclusively establish his liability for freight. *Central Railroad* v. *MacCartney, supra.*

But this was not a mooted question at the trial. The important controversies were as follows: Defendant denied that plaintiff was entitled to charge for car service or demurrage at all; or, if so entitled, that the charges were reasonable; denied that plaintiff had made or tendered a good delivery, especially claiming that delivery should have been made at a private siding, and also that plaintiff was not entitled to receipts for the carloads when and as demanded. The trial judge held that the right to charge demurrage was clear, both by common law and our statute (*Pamph. L.* 1903, *p.* 670, § 47), but left it to the jury to say whether the railroad had laid a proper foundation to support a claim for demurrage in the particular case. He also left to the jury the question

whether the charge of one dollar a day for demurrage was a reasonable one; whether the railroad was bound to deliver on the private siding, or rather, whether the siding in dispute "was a private siding, and not a siding used generally by the company for the unloading or reception of freight," and also, whether the defendant was justified in refusing to sign receipts, confining his observations on this latter point to one car, which was locked, as though it was typical of all the cars, which it was not. The jury found a verdict for defendant, and the judgment thereon is now before us for review.

Our examination of this case leads us to the following conclusions:

*First.* That the court erred in leaving to the jury the question whether plaintiff was bound to deliver on the special siding.

*Second.* That the court erred in regard to the right to receipts for certain cars.

*Third.* That the court erred in leaving to the jury the question whether the charge of one dollar per day demurrage was a reasonable one.

With respect to the special siding, there seems to be no evidence that the defendant lumber company had any contract with the railroad company to put cars on it for delivery. The railroad had no control over it, and, as the court correctly charged, would lose its lien by placing cars there, notwithstanding it asserted a lien upon car No. 100,824, which was placed on the siding locked, and when broken open by defendant was recaptured by plaintiff and sent out of defendant's reach. The regular station of plaintiff was called Wanaque-Midvale, where there was an adequate supply of sidings. The special siding, or spur, to describe it more accurately, belonged not to defendant, but to a paper mill, which had licensed its use by defendant. Some cars in controversy were billed to the "Paper mill and lumber yard siding," but this billing gave defendant no rights to have them put there. So far as we can discover by the testimony, although it appeared that other parties had from time to time

used this siding, there was no jury question as to the "usual place of delivery," which was clearly at the railroad station.

As to the receipts refused by the defendant, the court charged the jury in effect that the railroad had a right to exact a receipt before delivery, if it was merely a receipt, and if defendant had a reasonable opportunity to inspect their goods and know what they were signing for, but that they were not required to sign a receipt stating that the goods were in good order if they were in bad order, nor any receipt for a carload of goods that was locked up, and which a prudent man had reason to believe did not contain the property specified. This charge, besides ignoring the fact that in the case of at least two cars there was the fullest opportunity for inspection of their contents, permitted the jury to assume that the receipts, as demanded and refused, specified that the property was in good order, for which assumption there was no foundation in the evidence.

The third error which we find it necessary to discuss was the submission to the jury of the question whether one dollar a day was a reasonable demurrage charge. The action of the jury on this question doubtless entered as a factor into their determination of the question whether proper delivery had been tendered, *i. e.,* the freight charges being conceded correct in amount; the car delivered at the proper place (or, as in the case of car No. 100,824, actually on the spur desired by the defendant), and all other questions being eliminated, the legality of the tender would be made to depend on whether this rate of one dollar a day as charged was reasonable or unreasonable in the minds of the jury. But no such question should have been submitted for their determination. It was shown that the car service rules had been duly filed with the interstate commerce commission. A copy of those rules was in evidence, from which it appeared that the charge of one dollar per car per day was prescribed as the demurrage or car service charge after forty-eight hours' free time for unloading. Hence the question was not open in the trial court, the defendant's duty in the premises, if it considered the charge

unreasonable, being to appeal to the interstate commerce commission for its modification (*Texas and Pacific Railroad Co. v. Abilene Cotton Oil Co.*, 204 *U. S.* 426), that body having jurisdiction of terminal charges as well as freight rates. *Interstate Commerce Commission* v. *Chicago, &c., Railway Co.*, 186 *Id.* 320. So that, under the authority of these federal decisions, the jury should have been instructed as matter of law that as the cars in question had come from another state, the charge for demurrage must be regarded as reasonable, in the absence of any adverse action of the commission.

There has been some difficulty in reaching the results above given, mainly due to the manner in which the case was presented in the trial court. With regard to the effect of the Interstate Commerce act and the car service rules, it is fair to the trial court to say that this point, while in our opinion fairly presented, was accompanied by a number of requests to charge which implied that the question as to what was a reasonable charge for demurrage was expected to be left to the jury, so that, while counsel was undoubtedly entitled to submit requests bearing on both aspects of the case, that course tended to obscure an issue which has been exhaustively treated in the brief before us, and on which the present decision in large measure turns.

For the reasons above stated, the judgment will be reversed, and a *venire de novo* awarded.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, BOGERT, VROOM, GREEN, GRAY, DILL, J.J. 12.